IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37092-5-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | OPINION PUBLISHED IN PART |
| | ) | |
| TRAVIS VERN LAHMAN, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, C.J. — General Rule 37 of the Washington Court Rules restricts a party's ability to remove prospective jurors from a jury panel without cause. The rule was intended to reduce racial discrimination in jury selection by focusing on the danger of implicit bias. Under GR 37, a judge must deny a party's attempt to remove a juror without cause (known as a peremptory challenge) if an objective observer *could* view race or ethnicity as *a* factor in the attempted removal. Under the terms of the rule, an objective observer must be deemed aware of implicit, institutional, and unconscious bias, in addition to purposeful discrimination.

The prosecutor handling Mr. Lahman's trial exercised a peremptory challenge against a prospective juror with an Asian surname. It is undisputed that the juror was one of the few racial or ethnic minorities on the jury venire. The prosecutor explained she

sought to remove the juror because he was young and inexperienced in domestic matters.[1]

The record indicates the prospective juror was 23 years old. However, the juror was never

asked any questions about his experiences in domestic matters. In fact, he was not asked

many questions at all. Given the limited basis from which the prosecutor could conclude

the juror was inexperienced, along with the possible influence of implicit stereotyping,[2] it

is conceivable an objective observer could conclude race or ethnicity played some sort of

role in the decision to strike the prospective juror from the venire. Mr. Lahman's GR 37

objection to the prosecutor's use of the peremptory challenge therefore should have been

sustained.

Under our case law, the remedy for the erroneous exclusion of a juror from service

on the basis of race or ethnicity is reversal and remand. We invoke this remedy, reverse

Mr. Lahman's convictions, and remand for retrial.

FACTS

In December 2018, Travis Lahman was arrested for the brutal assault of his long-

term girlfriend. He was charged with one count of first degree kidnapping and one count

---

[1] Mr. Lahman's case involved allegations of domestic violence.
[2] In recognizing the existence of stereotypes, we in no way wish to condone or endorse any stereotypes.

of second degree assault. The State later amended the charges to include four firearm

enhancements. Mr. Lahman exercised his right to a jury trial.

Jury selection took place over two days in 2019. One of the prospective jurors

on the venire was a 23-year-old man with an Asian surname (Juror 2). Juror 2 worked

for Target and appeared to be one of the few racial minorities on the venire. In his

answers to a written questionnaire submitted prior to voir dire, Juror 2 did not report any

past experience with domestic violence. Twenty-two additional prospective jurors

provided the same answer; i.e., that they had no past experience with domestic violence

either personally or through a close associate.

The parties did not engage Juror 2 in much dialogue during voir dire. Other than

his initial introduction, Juror 2 spoke twice. The first comments were made in response

to a question posed by the prosecutor:

> [THE PROSECUTOR]:
> . . . .
> Is it important that you serve as members of a jury? I'm going to go
> to Juror No. 2.
> Is it important to serve?
> PROSPECTIVE JUROR NO. 2: Yes.
> [THE PROSECUTOR]: And why is that?
> PROSPECTIVE JUROR NO. 2: It's your civil duty.
> [THE PROSECUTOR]: Civic duty.

3 Report of Proceedings (RP) (June 4, 2019) at 787. The second set of comments

were made in response to questions from defense counsel:

> [DEFENSE COUNSEL]:
> . . . .
> If you disagree with another juror on the verdict, could you stick to
> your guns unless you became convinced?
> Number, how about 2?
> PROSPECTIVE JUROR NO. 2: Similar sentiment [to that of a
> previous juror[3]].
> [DEFENSE COUNSEL]: Okay.
> PROSPECTIVE JUROR NO. 2: Solid with my opinion based on the
> evidence and what I see.
> [DEFENSE COUNSEL]: And how would you feel if you were the
> only one to hold your viewpoint?
> PROSPECTIVE JUROR NO. 2: Probably awkward, but given the
> evidence, I don't think that would be likely.
> [DEFENSE COUNSEL]: Okay.
> But would you stick to your viewpoint unless you became convinced
> otherwise?
> PROSPECTIVE JUROR NO. 2: Yes.

*Id*. at 826-27.

The State used a peremptory challenge against Juror 2, to which Mr. Lahman

objected under GR 37. The State provided the following explanation to the trial court

in response to the challenge:

> Your Honor, with regard to [Juror 2], he is a younger juror. He did
> respond to the questions; however, given his age and then some of his
> questions, I felt that he was not going to be an acceptable juror. He—has

---

[3] The previous juror had stated: "It would be hard but you have to stick to what
you know in order to keep the whole trial process fair, you know." *Id*. at 826.

nothing to do with this—Your Honor, he's more than [sic] his age and then I got limited answers out of him in my questioning.

1 RP (Jun. 4, 2019) at 44. The State proceeded to clarify:

He's a younger juror, works at Target. Yeah, I would generally not have a younger person sit on a case like this. They don't have life experiences and he didn't have any with [domestic violence].

*Id*. at 45.

The trial judge determined the basis for the State's peremptory challenge was Juror 2's age and lack of life experience. Initially the judge granted Mr. Lahman's GR 37 challenge. But the judge later relented, explaining age and lack of experience were valid race-neutral reasons for the State's peremptory challenge. Juror 2 was therefore stricken from the venire and did not serve further. The record reflects that of the 13 jurors seated on the panel, nine of them likewise did not report any experience with domestic violence. After a four-day trial, the jury found Mr. Lahman guilty as charged, including the four firearm enhancements. He was sentenced to 254 months' imprisonment.

Mr. Lahman now appeals, arguing the trial judge improperly overruled his objection to the State's use of a peremptory challenge against Juror 2.

ANALYSIS

*Peremptory challenges and the problem of discrimination*

The state and federal constitutions protect the right of the criminally accused to a

5

fair and impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Standards for

juror qualification and the ability to strike jurors for cause enable the court and parties to

ensure a biased juror does not sit in judgment on a particular case. *See State v. Davis*,

141 Wn.2d 798, 824-26, 10 P.3d 977 (2000). This is all that is constitutionally required.

*See Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988).

Nevertheless, tradition, statutes, and court rules go further. In addition to enforcing juror

qualification standards and challenges for cause, parties may use "peremptory challenges"

to strike a limited number of otherwise qualified jurors from the venire for no stated

reason. *See* RCW 4.44.130.-.140; CrR 6.4(e). The justification for peremptory strikes

is that trial attorneys have instincts about which jurors will be best for their case.

Peremptory challenges enable parties to rely on their instincts and experiences to select

a jury that they think will be best for their case.

Not surprisingly, the use of instincts to render judgment about other people's

thought processes and beliefs has historically opened the door to implicit and explicit

bias. The parties and the jurors themselves have the right to a trial process free from

discrimination. *Powers v. Ohio*, 499 U.S. 400, 409, 111 S. Ct. 1364, 113 L. Ed. 2d 411

(1991). Judges have been assigned an important role in protecting these rights and

ensuring peremptory challenges are not used in a discriminatory manner. Because

6

"the Constitution forbids striking even a single prospective juror for a discriminatory purpose," mistakenly allowing a party to dismiss a juror for reasons of race or ethnicity requires reversal and remand for a new trial. *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) (cited with approval by *Snyder v. Louisiana*, 552 U.S. 472, 486, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008). This remedy applies regardless of the strength of the prosecutor's case or the hardship to victims or witnesses.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the United States Supreme Court developed a three-part test for assessing whether a peremptory challenge was based on improper discrimination. First, the party objecting to the challenge had to establish a prima facie case giving rise to an inference of discriminatory purpose. *Id*. at 92-93. If this was met, the burden shifted to the party asserting the challenge to provide a neutral explanation. *Id*. at 97. If this was accomplished, the judge had to decide whether the objecting party "established purposeful discrimination." *Id*. at 98.

*Batson*'s requirement of proving purposeful discrimination has been problematic. *State v. Saintcalle*, 178 Wn.2d 34, 53, 309 P.3d 326 (2013) (plurality opinion), *abrogated on other grounds by City of Seattle v. Erickson*, 188 Wn.2d 721, 398 P.3d 1124 (2017).

7

Intent is difficult to prove and judges may be loath to ascribe invidious motives to an attorney who regularly practices in their court. *Id.* In addition, harmful discrimination is often not purposeful in the ordinary sense. *Id.* at 46. Most Americans condemn overt acts of racism. Yet the plague of racism persists. The problem is not so much a conscious desire to discriminate. *Id.* at 48. It is that negative stereotypes and assumptions operate on a subconscious level and lead people to make discriminatory decisions without any sort of purposeful plan or deliberation. *Id.* at 46 ("Racism now lives not in the open but beneath the surface—in our institutions and our subconscious thought processes— because we suppress it and because we create it anew through cognitive processes that have nothing to do with racial animus.").

*GR 37 as a method of addressing discrimination in peremptory challenges*

In 2018, the Supreme Court of Washington adopted GR 37 to address unconscious bias and the difficulties in meeting *Batson*'s three-part test. *See State v. Jefferson*, 192 Wn.2d 225, 243, 429 P.3d 467 (2018) (plurality opinion). Under GR 37(c), a party or the court "may object to the use of a peremptory challenge to raise the issue of improper bias." Once an objection is raised, the party exercising the challenge is obliged to articulate the reasons for the challenge. GR 37(d). The court must then evaluate the reasons given for the challenge, taking into account the totality of the circumstances.

GR 37(e). "If the court determines that an objective observer *could* view race or ethnicity as *a* factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." *Id*. (emphasis added). For purposes of this rule, an "objective observer" is one who "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f).

GR 37 provides a guided process for how to assess the issue of bias and peremptory challenges. The rule lists five nonexclusive circumstances relevant to assessing the nature of a peremptory challenge. GR 37(g).[4] The rule also specifies seven

---

[4]
     (i) the number and types of Questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to Question the prospective juror about the alleged concern or the types of Questions asked about it;
     (ii) whether the party exercising the peremptory challenge asked significantly more Questions or different Questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;
     (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party.
     (iv) whether a reason might be disproportionately associated with a race or ethnicity; and
     (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

presumptively invalid justifications for peremptory challenges. GR 37(h).[5] Finally, the

rule identifies juror conduct (e.g., juror inattentiveness, body language, or demeanor) as

suspect justification for a peremptory challenge. GR 37(i). If a party intends to offer juror

conduct as a justification for a peremptory challenge, the party must provide timely notice

so the juror's behavior can be "verified and addressed in a timely manner." *Id.*

*Application of GR 37 to Mr. Lahman's case*

Mr. Lahman argues Juror 2 was improperly stricken from his jury in violation

of GR 37. Because the GR 37 analysis is purely objective, this claim is one we review

de novo. *State v. Listoe*, 15 Wn. App. 2d 308, 321, 475 P.3d 534 (2020); *State v. Omar*,

12 Wn. App. 2d 747, 750-51, 460 P.3d 225, *review denied*, 196 Wn.2d 1016, 475 P.3d

164 (2020).

---

[5]

    (i) having prior contact with law enforcement officers;
    (ii) expressing a distrust of law enforcement or a belief that law
enforcement officers engage in racial profiling;
    (iii) having a close relationship with people who have been stopped,
arrested, or convicted of a crime;
    (iv) living in a high-crime neighborhood;
    (v) having a child outside of marriage;
    (vi) receiving state benefits; and
    (vii) not being a native English speaker.

The first step in the GR 37 process is for a party or the court to raise the issue of improper bias on the basis of race or ethnicity. GR 37(a), (c). Here, Mr. Lahman claims the prosecutor was biased in striking Juror 2, a racial or ethnic minority, from the venire. As an appellate court, we are unable to physically observe any juror's appearance. In some circumstances, this might hamper our de novo GR 37 analysis. *See Listoe*, 15 Wn. App. 2d at 331-32 (Melnick, J. concurring). But here, Juror 2 has an Asian surname. This circumstance is enough to raise the concern that an objective observer could perceive Juror 2 as a racial or ethnic minority.[6]

Because Mr. Lahman has objected to the use of a peremptory challenge against an individual who appears to be a member of a racial or ethnic minority, we proceed to the second part of the GR 37 analysis. Under GR 37(d), the party exercising the peremptory challenge must provide a race-neutral justification.[7] Here, the prosecutor claimed to strike

---

[6] We emphasize that GR 37 has to do with appearances, not with whether a juror actually identifies with a racial or ethnic minority group. In many cases, a trial judge will need to make a record about the apparent racial and ethnic makeup of a jury panel in order to facilitate review on appeal.

[7] GR 37(d) does not explicitly state that the party exercising the peremptory challenge must supply a justification for the strike that is race neutral, but this is implicit given the nature of the rule and its legal underpinnings.

Juror 2 based on his young age and lack of experience with domestic violence and limited life experience.

The third step of the GR 37 analysis is to evaluate the justification given for the peremptory challenge. Our assessment is guided by the nonexclusive circumstances set forth in GR 37(g). We also must keep in mind that the test is whether an objective observer, aware of implicit, institutional, and unconscious biases, "*could* view race or ethnicity as *a* factor in the use of the peremptory challenge." GR 37(e) (emphasis added).

The first three circumstances we look to are how the prospective juror was questioned and whether there were differences between the challenged juror and other members of the venire. GR 37(g)(i)-(iii). Juror 2 was not questioned about his life experiences. In fact, the prosecutor posed very few questions to Juror 2, thus depriving Juror 2 of a realistic opportunity to explain himself and his circumstances. GR 37(g)(i). Juror 2 did state on his questionnaire that he did not have any prior experiences with domestic violence. However, 22 other members of the venire provided the same answer. It appears that nine of the individuals who sat on Mr. Lahman's petit jury answered the juror questionnaire in the same way as Juror 2; i.e., they also did not have past experience with domestic violence. The prosecutor's limited interactions with Juror 2 fail to reveal

whether he truly stood out from other jurors in terms of his age or other experiences.[8]
GR 37(g)(iii).

The next circumstance we consider asks whether the reason stated for the challenge might be disproportionately associated with race or ethnicity. GR 37(g)(iv). Here, stereotyping can come into play. A stereotype is a trait imposed on a group of people based on a shared characteristic such as race or ethnicity. Reliance on a stereotype may seem positive, negative, or benign. Regardless, stereotyping is harmful and can have an improper disparate impact. Research shows that a common stereotype of Asian Americans is that they are strong in academics, to the detriment of interpersonal skills.[9] In explaining why Juror 2 was preemptively struck from the venire, the prosecutor

---

[8] There was no record made of the ages of other members of the venire. This would have been helpful to our analysis.

[9] Adeel Hassan, *Confronting Asian-American Stereotypes*, N.Y. TIMES (June 23, 2018), https://www.nytimes.com/2018/06/23/us/confronting-asian-american-stereotypes.html; *see also* Monica H. Lin et al., *Stereotype Content Model Explains Prejudice for an Envied Outgroup: Scale of Anti–Asian American Stereotypes*, 31 PERSONALITY & SOC. PSYCHOL. BULL. 34, 37 (2005) (research study showing Asian-Americans are perceived as being less sociable, overly academic, lacking "street smarts"), https://www.researchgate.net/profile/Susan-Fiske/publication/8152313_Stereotype_Content_Model_Explains_Prejudice_for_an_Envied_Outgroup_Scale_of_Anti-Asian_American_Stereotypes/links/0c960529d08ca13f6b000000/Stereotype-Content-Model-Explains-Prejudice-for-an-Envied-Outgroup-Scale-of-Anti-Asian-American-Stereotypes.pdf.

focused on Juror 2's youth and lack of life experiences. While Juror 2's age may have prompted much of the prosecutor's concerns, there was little else to support the prosecutor's assessment of Juror 2. Instead, the record left open the possibility that the prosecution implicitly and unsuitably relied on a stereotype in deciding Juror 2, an Asian American, lacked the frame of mind to side with the State.

The last of the circumstances we consider focuses on a party's use of peremptory challenges in the present case or past cases. GR 37(g)(v). The record on review is insufficient to allow us to analyze this factor.

On balance, the State's explanation for why it struck Juror 2 is insufficient to dispel the concern that "an objective observer *could* view race or ethnicity as *a* factor" in Juror 2's exclusion from the jury pool. GR 37(e) (emphasis added). Juror 2's statements during voir dire did not differ markedly from those of other prospective jurors. The prosecutor received limited information from Juror 2 largely due to the fact that Juror 2 was asked few questions. The prosecutor's focus on Juror 2's youth and lack of life experiences played into at least some improper stereotypes about Asian Americans, particularly given the lack of any record about the relative ages of other jurors.

Our assessment of this case does not mean the prosecutor's decision to strike Juror 2 was in fact driven by improper discrimination, purposeful or not. GR 37 was

written in terms of possibilities, not actualities. The rule recognizes the trial process must be free from the appearance of discrimination, regardless of actual motives or intent. The switch from *Batson*'s focus on purposeful discrimination to GR 37's emphasis on the objective possibility of discrimination is significant. The exercise of peremptory challenges is a privilege, not a constitutional right. GR 37 teaches that peremptory strikes exercised against prospective jurors who appear to be members of racial or ethnic minority groups must be treated with skepticism and considerable caution.

We recognize that GR 37 is a new rule and appellate decisions interpreting the rule postdate Mr. Lahman's trial. The trial court understandably struggled with application of the rule to Mr. Lahman's case. Nevertheless, our de novo standard of review does not allow deference to the trial court's decision. We disagree with the trial court's assessment of Mr. Lahman's GR 37 objection, as set forth above. The GR 37 objection should have been sustained. The applicable remedy is to reverse Mr. Lahman's convictions without prejudice and remand for a new trial.

The panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports, and that the remainder having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

15

Mr. Lahman has lodged several additional challenges to his convictions. All but

his sufficiency challenge are mooted by our decision reversing his convictions.[10] We

therefore limit the remainder of our analysis to Mr. Lahman's sufficiency claim.

In a pro se statement of additional grounds for review, Mr. Lahman raises a

sufficiency challenge to the jury's imposition of firearm enhancements. Mr. Lahman

claims the evidence was insufficient to prove the instruments used in his offense qualified

as firearms. Our analysis of a sufficiency challenge is governed by a very deferential

standard of review. The State's evidence is presumed as true and all credibility issues are

resolved in favor of the jury's verdict. *See State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d

310 (2014); *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

A defendant who is armed with a deadly weapon at the time of an offense may be

subject to a firearms enhancement. RCW 9.94A.825, .533(3)-(4). "'Firearm' means a

weapon or device from which a projectile or projectiles may be fired by an explosive such

as gunpowder." RCW 9.41.010(11). To support a firearm enhancement, the State must

present evidence that the firearm used in the commission of a crime was a firearm in-fact,

rather than a gun-like object. *State v. Tasker*, 193 Wn. App. 575, 595, 373 P.3d 310

---

[10] A successful challenge to the sufficiency of the evidence would bar the State
from retrial. *State v. Hickman*, 135 Wn.2d 97, 99, 954 P.2d 900 (1998).

(2016). "Evidence that a device appears to be a real gun and is being wielded in committing a crime is sufficient circumstantial evidence that it is a firearm." *Id*. at 594. Sufficient evidence of a firearm is presented when a victim, even one who has little experience with firearms, testifies to seeing and hearing an object used in the commission of a crime that is visually and audibly consistent with a firearm. *Id*. at 595.

Here, the victim testified to seeing Mr. Lahman use two firearms. First, Mr. Lahman confronted the victim with what she believed was his .38-caliber handgun, and used it to coerce her into the master bedroom. The victim was familiar with this specific firearm as a result of her 26-year relationship with Mr. Lahman, and testified she oftentimes witnessed Mr. Lahman carrying the handgun. Second, Mr. Lahman produced a shotgun from the bedroom closet, checked to make sure it was loaded, and pointed it at the victim while threatening to kill her. The victim testified she was also familiar with this firearm, and that Mr. Lahman commonly kept it in that specific closet. This is direct evidence that the devices appeared to be real guns and were wielded in the commission of a crime.

Mr. Lahman criticizes the victim's testimony as not credible. He claims she lacked familiarity with firearms and therefore could not be relied upon to differentiate between a true firearm and a firearm-like object. Mr. Lahman's complaint is one that might find

17

success with a jury, but it fails here given the irrelevance of credibility assessments on appellate review.

The State presented sufficient evidence for the jury to find Mr. Lahman had used firearms in the commission of his crimes. Therefore, he is not entitled to reversal with prejudice.

## CONCLUSION

We reverse Mr. Lahman's convictions without prejudice and remand for a new trial.

_____
Pennell, C.J.

WE CONCUR:

_____        _____
Fearing, J.                                              Staab, J.